GARDNER *v.* ONE THOUSAND FOUR HUNDRED AND SIXTY-SEVEN BALES OF COTTON and another.[1]

*(Circuit Court, S. D. Florida. November Term, 1883.)*

ADMIRALTY—UNSEAWORTHY VESSEL.

Where cargo is laden on board of a ship whose owners know that she is not seaworthy, and who have put her up for a long voyage that they never intended she should complete, but intended to fraudulently break up the voyage at an intermediate port, which intention was afterwards carried out, *held,* that all the expenses of taking the vessel into the intermediate port, and her expenses there, and the cost of discharging, storing, and reshipping cargo, must be borne by the ship and her owners, and are not a legitimate charge against the cargo.

Admiralty Appeal.

*Treadwell, Cleveland & G. B. Patterson,* for claimants.

*L. C. Bethel,* for Philbrick, intervenor.

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

PARDEE, J. This cause came on to be heard on the record and evidence, and was argued, whereupon the court, being advised in the premises, doth find the following facts in the case:

(1) On June 3, 1878, the ship Marie Fredrikke, laden with a cargo of 3,601 bales of cotton, 2,000 barrels of résin, and 8,290 staves, sailed from the city of New Orleans, ostensibly on a voyage to Liverpool.

(2) This vessel in 1876, then known as the Almora, had put into Key West when on a voyage from New Orleans towards Liverpool, laden with cotton, and had there been condemned as unseaworthy. At this time she was consigned to John J. Philbrick, of Key West, and she was purchased from Philbrick by Adolphus C. Diesen, who was then in Key West, ex-bark Cadiz. Diesen had remained for some time in Key West awaiting the arrival of funds with which to purchase this vessel, and his business office at this time was at the office of the said Philbrick.

(3) In 1877 Diesen took the Almora to Pensacola, and there loaded her with a cargo of lumber for Europe. She put into Key West, leaking and in distress, and was there consigned by Diesen to Philbrick. Her cargo of lumber was discharged at Key West, and the vessel was taken by Diesen to New Orleans for repairs, leaving Key West in February, 1878.

(4) At New Orleans this vessel was put upon the dry-dock and repaired. While on the dry-dock she was libeled by Brady & McClellan, and sold to them for $2,000. This proceding was taken to avoid the payment of the bills incurred by the vessel at Pensacola, and the sale was made with the understanding that Brady & McClellan were to transfer the vessel back to the captain. This transfer was subsequently made to the mate of the vessel, Ernest Sissenere, a Norwegian, for $12,000, the cost of repairs. While the vessel was at New Orleans her name was changed to Marie Fredrikke.

(5) The repairs made at New Orleans consisted mainly of new assistant keelsons, placed along-side of the main keelson; strengthening braces or arches, two in number, running the whole length of each side of the ship; sheathing and caulking.

(6) The hull of the vessel was hogged before she was placed on the dry-dock. On the dry-dock this hog was partially removed. When the vessel came off the dry-dock she settled back a number of inches towards her original shape, but was less hogged than before going upon the dock.

(7) When the vessel left New Orleans her pumps, spars, tops, and outfit were as follows:

(a) Her main pumps were two. They were so constructed that they straddled the keelson like an inverted Y. They could not be sounded, nor could they be hoisted out when the vessel was loaded, nor was there any way of reaching the bottom of these pumps. There was no sounding-well. The pump gear was very much worn, and one

of these main pumps threw very little water on the voyage. It was practically of no use whatever. The wind-mill pump consisted below deck of a single tube of iron. There was no sounding-well for this pump, and the only way of sounding it was by lifting the port-box and sounding down through the pump-tube itself. This tube ran through the assistant keelson, and the sounding-rod, going down the tube, struck on the top of a timber, which was gouged out about one and one-half inches, to let the water have access to the bottom of the tube. The assistant keelson was laid, not on the skin, but on the timbers, and the skin at the bottom of the wind-mill pump was four inches thick. A depth of eight inches of wet sounding-rod down this pump would indicate that the water was two and one-half inches over the skin or ceiling. The wind-mill pump required a breeze of five knots to work, and its boxes and joints were worn out, and wanted renewing.

(b) Several of the spars of the vessel were rotten, and needed replacement. The vessel carried but one spare spar and a half of another one. On leaving Key West, in February, 1878, she left one of her spars there. The fore and mizzen tops of the vessel were also rotten.

(c) The vessel was insufficiently supplied with provisions for a voyage to Liverpool, and there is no proof that she had sufficient water stowed under her deck for such a voyage.

(d) The steering apparatus worked very stiffly.

(e) The crew was composed of the captain, first mate, second mate, cook, nine men, and three boys,—in all, sixteen,—and was not sufficient for the voyage to Liverpool.

(8) On June 4, 1878, at New Orleans, a bottomry bond for $10,-430.80, with interest at the rate of 20 per cent., making in all the sum of $12,516.96, was executed by Ernest Sissenere, the mate of the vessel, and her nominal owner, which bond was payable on her arrival at Liverpool.

(9) Before the vessel left New Orleans, Diesen drew, as advances on freight, £2,174 4s. 9d., which sum represented about three quarters of the freight he would have earned by the safe arrival of the vessel at Liverpool.

(10) In going out of the mouth of the Mississippi the vessel struck on a mud lump near the end of Eads' jetties. She grounded at about noon on June 5th, and remained there until June 7th, about 2 o'clock P. M. The vessel grounded because her steering apparatus worked heavily, and those in charge of her wheel could not throw it quickly enough to follow the tow-boat. During the whole of the time the vessel lay upon the lump the weather was fine, and the sea almost calm. The vessel was not in motion, and made no water. Her sails were set all the time, and at night there was only a one-man watch kept on deck. The character of the bottom where the vessel lay was soft mud. It is an ordinary incident of navigation for vessels to stick on the mud lumps near the mouth of the Mississippi without

suffering other damages than such as result from delay. This vessel received no damage by reason of sticking on the lump save delay, and probable loss of about 30 feet of false shoeing. False shoeing is timber from 6 to 10 inches deep, spiked on the lower edge of the keel, not bolted through, for the purpose of making the vessel hold the wind and not drift. On the afternoon of the seventh of June, a breeze springing up, the vessel, with all her sails set, slid off the lump, and for the next two or three hours made about four knots an hour.

(11) On the voyage to Key West the weather was fine. No storm, or even fresh breeze, was experienced. The vessel carried all her sails during all the voyage, with the exception of her maintop-gallant sail for a few hours. Much of the time the vessel was without steerage way. On the voyage the vessel leaked no more than vessels of her age and loading usually leak. The wind-mill pump did not work on the voyage, and the starboard main pump threw but very little water. The water on the voyage came up no higher than an inch or two up on the resin which was used for dunnage, and was controlled by a single pump.

(12) On June 17th the vessel dropped anchor outside the reef at Key West. Within an hour or two after this Capt. Diesen, the second mate, and two of the crew, went to Key West, and landed at Philbrick's wharf. The vessel did not come to Key West until June 24th, remaining during the whole week outside of the reef. On June 24th she was towed into Philbrick's wharf. Capt. Diesen and the second mate remained in Key West until the vessel reached the dock. The two of the crew who left the vessel with Diesen on June 17th are said to have returned on June 19th. One of these had a bone felon and the other a disgusting disease. During the whole of the time the vessel remained outside the reef, viz., from June 17th to June 24th, she did not leak more than vessels of her age and loading usually do. On several of the nights of the week June 17th–24th there was a one-man watch on deck only.

(13) On June 18th Joseph C. Whalton, Jr., the acting agent of underwriters at Key West, notified Philbrick and Diesen, at Philbrick's office, that he represented underwriters on the cargo of the vessel, and was requested by them to attend to their interest therein.

(14) On June 19th Diesen bought the hull and materials of the brig Mohawk, which vessel had been consigned to Philbrick, and was sold under condemnation. On or about that day Diesen declared in Key West that he intended to take this brig to Norway, and that his mate was to take the Marie Fredrikke there, and that he desired to purchase the cargo of the brig Mohawk to use as ballast, partly for the brig and partly for the vessel. Philbrick, on or about June 20th, paid for the hull and materials of the Mohawk, bought by Diesen.

(15) On June 9th Whalton showed to both Philbrick and to Diesen other dispatches he had received from the underwriters on the cargo of the vessel, asking that the discharge be prevented until the arrival

of a special agent sent from New York. On June 19th both Philbrick and Diesen declared separately to Whalton that the Marie Fredrikke would come up to the dock on June 21st, and begin to discharge on June 24th. On June 21st Whalton again communicated with Diesen, sending him a copy of the dispatch that day received by him from underwriters, to advise the master to await the arrival of the special agent, and to protest against discharging at that time.

(16) On June 24th, at about 4 P. M., the vessel came to Philbrick's dock, and a survey was held upon her. The report of the surveyors stated that the vessel was leaking eight inches an hour. The evidence shows that no particular examination was made as to the rate the vessel was leaking, and that she was not leaking at any unusual rate. The surveyors were accompanied by Diesen to the vessel, and he returned with them to Philbrick's office. The report is in the handwriting of Philbrick.

(17) On June 24th, at Key West, the vessel was in as good a condition of seaworthiness as when she left New Orleans, except the loss of the false shoeing referred to, tenth finding. On the night of June 24th, and on all other nights while the vessel lay at Philbrick's dock or at Key West, there was a one-man watch on deck.

(18) On the night of June 24th Whalton served on Diesen, at the vessel, a protest against discharging the vessel. On June 24th Diesen signed and sent to Whalton a letter, in Philbrick's handwriting, falsely stating that the vessel since his arrival off Key West had been leaking badly, requiring the constant service of the crew at the pumps, and on June 28th Capt. William R. Gardner, the special agent spoken of, arrived at Key West, and at his request the discharging of the vessel was discontinued. The discharge was resumed on July 4th, and continued until and including July 6th, when the vessel was sent to quarantine.

(19) Between June 28th and July 4th Diesen was urged by Capt. Gardner, and by Capt. Conway, an agent of the New Orleans underwriters, to discharge only cargo enough to repair his main pumps; to take on board a steam-pump which threw 1,200 gallons a minute, an engineer, coal, and extra men, all free of expense to him, and proceed on his voyage. This he refused to do. On August 7th the vessel came back from quarantine to Philbrick's dock, and the discharge was recommenced, and continued until August 12th, by which time all of the cotton had been discharged, and all the resin, save 800 barrels left in her for ballast.

(20) A second survey, held on August 15th, recommended that the vessel be hove down. This was not done until September 23d, Philbrick refusing to have his dock used for the purpose until then. On September 19th Diesen left Key West in the Mohawk, having given a power of attorney to Philbrick to act for him. The top sides of the vessel were not caulked before she was hove down, as should have been done. The vessel leaked so much when being hove down that

they were obliged to right her. In doing this she broke away, her main and mizzen masts went overboard, and she became a wreck.

(21) The said ship Marie Fredrikke, when she sailed from New Orleans in June, 1878, was not in a condition as to her hulls, spars, tops, pumps, and steering apparatus to withstand the ordinary perils of the sea, wind, and waves, in a voyage to Liverpool. She was in as good condition when she arrived in Key West as when she left New Orleans, except the loss of about 30 feet of false shoeing, heretofore referred to. She could not have been repaired and supplied at Key West, so as to make her seaworthy for the continuance of the voyage to Liverpool, without extraordinary delay and expense, even if the hull could have been repaired and made seaworthy at all.

(22) When the Marie Fredrikke sailed from New Orleans, in June, 1878, it was not with the *bona fide* intention of her master and owner to prosecute a voyage to Liverpool, but it was their intention to consign the ship and cargo in Key West and break up the voyage, as was subsequently done. That Philbrick, the petitioner in this case, was aware of the intention of the master and owner of the Marie Fredrikke does not appear from the evidence, nor does his good faith in the transactions for which he claims compensation affirmatively appear.

(23) On October 7th the libel claiming the possession of 1,467 bales of cotton, part of the cargo of said ship, was filed herein, and the answer was filed on October 9th. On October 10th a decree was made awarding possession of the cargo claimed to the libelant, on giving stipulation to pay the charges, if any, which Philbrick was entitled to. The question of what if any charges were to be allowed to Philbrick was ordered to be brought in by petition and answer. The petition of the said Philbrick was filed herein on November 19th, and the answer thereto on the same day.

(24) From the evidence, and as reported by the master, whose report is not excepted to, the 1,467 bales of cotton involved in this case, if liable to petitioner on account of the matters charged in the petition, would be chargeable, on account of general average, in the sum of $3,684.12, and on account of charges against cargo in the sum of $1,764.57, making a total of $5,448.69 due from February 24, 1879, all as per master's report in the record.

And thereupon the court finds the following conclusions of law:

(1) The expenses and charges incurred in taking the Marie Fredrikke into the port of Key West, in wharfage, storage, labor, wages, subsistence of crew, surveys, etc., and in discharging, storing, and reshipping cargo, all as determined by the approved master's report, aforesaid, should be borne by the ship and her owners, and are not a legitimate charge against the cargo.

(2) The petition of Philbrick herein should be dismissed, with costs.